**\*NOT FOR PUBLICATON\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHRISTINE C., individually and as Parent and Natural Guardian of D.C., a minor,<br><br>Plaintiffs,<br><br>v.<br><br>HOPE TOWNSHIP BOARD OF EDUCATION,<br><br>Defendant. | Civil Action No. 3:18-cv-03984-FLW-DEA<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

This case arises from a disagreement over special education services. Christine C. ("Parent" or "D.C.'s mother"), individually and on behalf of her son, D.C., a minor, filed a Petition for Due Process against the Hope Township Board of Education ("the District") with the New Jersey Department of Education ("NJDOE"), alleging that the District denied D.C. a free and appropriate education ("FAPE") under the Individuals with Disabilities Act ("IDEA"). *See* 20 U.S.C. § 1400, *et seq.* Ellen S. Bass, an Administrative Law Judge ("ALJ"), rejected Plaintiff's claims. Plaintiff then filed the operative federal Complaint, the parties cross-moved for summary judgment, and I issued an Opinion and Order dated December 30, 2019 ("Previous Opinion"), affirming three of the ALJ's determinations. *See* ECF Nos. 33-34. However, I reserved judgment on whether the District owed compensatory education for seventeen school days during which D.C. did not receive any instruction, and ordered further briefing. *Id.* Presently before the Court are the parties' Cross-Motions for Summary Judgment on this remaining issue. For the following

reasons, both summary judgment motions are **DENIED**, and this matter is **REMANDED** to the ALJ for further proceedings consistent with this Opinion.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

For the purpose of these motions, I incorporate the facts recounted in my Previous Opinion. *See* ECF No. 34. I also summarize what I deem relevant to the parties' present dispute, as drawn from the ALJ's decision, the administrative record,[1] and Statements of Material Fact ("SUMF"). *See, e.g.*, *G.N. v. Bd. of Educ. of Twp. of Livingston*, 309 Fed. App'x. 542, 543 (3d Cir. 2009) ("Inasmuch as we write primarily for the parties, we reprise only those facts that are helpful in our discussion of the case.").

### A.  *Summary of the Facts*

D.C., a middle school student with learning and behavioral challenges, moved to Hope Township in July 2016, from Woodrow Wilson Middle School in Clifton, New Jersey. *See C.C. o/b/o D.C. v. Hope Township BOE*, OAL No. 17825-16, Final Decision (Dec. 21, 2017), at 3, 5-6 ("ALJ Op."). Due to its small size, Hope Township relies on neighboring Belvidere School District to provide services to special-needs students pursuant to a "sending-receiving agreement." *Id.* Notwithstanding this agreement, Hope Township remains the Local Education Agency ("LEA") responsible for implementing Individualized Education Plans ("IEPs") for any student it sends to Belvidere. *See* ECF No. 34, at 5; Pl. SUMF, ¶ 6. D.C. attended Oxford Street School in Belvidere

---

1       Most references to the administrative record in this Opinion quote or describe testimony, but nearly all testimony involved reading-in documentary evidence such as emails, letters, voicemails, and IEP information. Given the length and disorganization of the record on appeal, it is more efficient to refer to the testimony directly. I do not, however, "scour the . . . records and transcripts, without specific guidance, in order to construct specific findings of fact" and make the parties' arguments for them. *Holland v. New Jersey Dep't of Corrections*, 246 F.3d 267, 285 (3d Cir. 2001); *Doeblers Pennsylvania Hybrids, Inc. v. Doebler*, 441 F.3d 812, n.8 (3d Cir. 2006); *see also Albrechtsen v. Bd. of Regents of Univ. of Wisconsin Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) ("Judges are not like pigs, hunting for truffles buried in the record.") (internal quotations omitted).

under these circumstances and with "the program described in [his] existing IEP." ALJ Op., at 3, 6-7; Def. SUMF, ¶ 82.

Almost as soon as D.C. began at Oxford, his teachers observed various behavioral issues, none of which were addressed in his IEP, including "compulsive [lying]," making inappropriate remarks to staff, and expressing a desire to harm himself. Def. SUMF, ¶ 84; ALJ Op., at 6. In a meeting convened with his mother on September 30, 2016, Hope Township and Oxford learned for the first time that D.C. took Ambilify for Attention Deficit and Hyperactivity Disorder, and Child Protective Services had been called to an incident involving his father. *See* ALJ Op., at 5; Def. SUMF, ¶¶ 88-90. Although D.C.'s mother described D.C.'s behavioral issues as "new" in a school setting, she indicated that "'dad noted [them] at home.'" *Id.* ¶ 92. Still, she did not request services beyond the IEP.[2] *Id.* ¶¶ 91-92. Oxford seemed to agree with this assessment: one staff member described D.C.'s "major [behavioral] changes" as "just transitional," *id.* ¶¶ 84, 86, while another testified that "related" special education services "were not in the IEP" because D.C. "was not demonstrating a need for such supports." *Id.* ¶ 94; *see also* ALJ Op., at 7 (noting staff "stressed that these concerns were [ ] rather typical for middle school age boys").

On October 6, 2016, Oxford sent D.C. home following an incident during which he left class yelling, hid from his teachers, tried to leave the building, and admitted to assaulting a staff member at his former school, among other things. *See* ALJ Op., at 11; ECF No. 34, at 8-9. Because of D.C.'s behavior that day, administrators placed Oxford on lockdown and called the police. *See*

---

2       The IEP that existed when D.C. transferred from Woodrow Wilson "neither indicated that D.C. was diagnosed with a psychological ailment, nor that he required counseling, therapeutic, or other behavioral related services. Aside from some general behavioral remarks and instructions for facilitating appropriate classroom behavior, the [ ] IEP did not indicate that D.C. exhibited a behavioral or emotional impairment that was sufficiently severe to necessitate the implementation of a [Behavioral Intervention Plan]; in fact, the document's first page read: 'Behavior Plan: *No*.' A.R. 822. Further, no exemptions from discipline were described in the [ ] IEP, which suggests that no psychological impairment precluded D.C. from adhering to a specific set of school rules or policies. A.R. 822. The IEP also did not include social, behavioral, or emotional goals." *See* ECF No. 34, at 16-17.

ALJ Op., at 11; ECF No. 34, at 8. Hope Township and Oxford learned from D.C.'s mother that evening that D.C. had been institutionalized. Then, on October 13, 2016, they learned from Woodrow Wilson that D.C. not only required an IEP to address learning disabilities, but a Behavioral Intervention Plan ("BIP"), which the school had failed to include in the transfer paperwork. *See* Def. SUMF, ¶ 108.

Hope Township placed D.C. on Homebound Instruction immediately. *See id.* ¶¶ 102-03; ALJ Op., at 6. Efforts to find a home instructor initially proved fruitless. *See* ALJ Op., at 6. Various visits to alternative placements also failed—including Warren County Special Services School, the Stepping Stone School, the Lakeland Andover School, and Mount Olive Middle School. *Id.*; *see also* Def. SUMF, ¶¶ 190-91 (describing these visits). Ultimately, on November 1, 2016, a private company began providing at-home instruction. Oxford invited D.C. back to school on November 17, 2016, and he returned on December 20, 2016. The period of time during which D.C. was on Homebound Instruction but without an instructor—*i.e.*, October 7, 2016, until November 1, 2016, or seventeen school days—gives rise to Plaintiff's present claim for compensatory education.

B.   *The ALJ's Decision on December 21, 2017*

On October 21, 2016, Plaintiff filed a request for a due process hearing with the NJDOE, alleging that D.C. was denied a FAPE under the IDEA[3] and demanding compensatory education for the duration of D.C.'s time at Oxford as well as the period during which he did not receive

---

3       A state receiving federal funding for education must provide students with disabilities with a "free appropriate public education," or FAPE. 20 U.S.C. §§ 1412(a)(1)(A), 1401(9); *see also CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 232 (3d Cir. 2013). The IDEA tailors the definition of a FAPE to the needs of each child through an "individualized educational program," or IEP, which is its "centerpiece." *Id.* § 1414(d)(1)(A); *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010). The IDEA also "establishes a private cause of action against a school district that fails to abide by its legal obligations." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010) ("The parent or guardian of a minor student who is denied the rights and procedures set forth in the IDEA is afforded the opportunity to file an administrative complaint and to appeal an adverse determination to a federal district court."); *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 240 (3d Cir. 2009).

Homebound Instruction.[4] Plaintiff also requested (1) a finding that Belvidere was the "stay put" placement for D.C., (2) a personal aide at Oxford, (3) a functional behavioral assessment, (4) independent evaluations, and (5) an IEP meeting. The ALJ held hearings on June 5, 2017, June 12, 2017, and October 16, 2017, then denied Plaintiff's claims on December 21, 2017.

Relevant to the parties' present dispute, under N.J.A.C. § 6A:14-2.7(n), a district "shall" request an "expedited hearing" if it seeks "to remove" a student with disabilities from school based on its belief that "it is dangerous for the student to be in the current placement," but "cannot agree to an appropriate placement" with the parent. *Id.* Because the District placed D.C. on Homebound Instruction on October 7, 2016, yet never applied for such a hearing or reached an agreement with D.C.'s mother beforehand, the ALJ determined that it violated D.C.'s procedural rights. *See* ALJ Op., at 15. This triggered N.J.A.C. § 6A:14-2.7(k), which provides that:

> [i]n matters alleging a procedural violation, an administrative law judge may decide that a child did not receive a FAPE only if the procedural inadequacies:
> 1.      Impeded the child's right to a FAPE
> 2.      Significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of FAPE to the child; or
> 3.      Caused a deprivation of educational benefits.

*Id.*; *see also G.N.*, 309 Fed. App'x. at 545-46. Pursuant to § 6A:14-2.7(k), the ALJ determined that D.C. did not receive Homebound Instruction because of Plaintiff's conduct, *see* ALJ Op., at 14-15, writing that "[t]he blame for the disruption to D.C.'s education [after October 6, 2016] falls squarely at his mother's feet." *Id.* at 16. The ALJ also reasoned that "[t]he efforts of Hope personal, and the assistance supplied by Belvidere staff, all evidence good faith attempts to find a school that would better meet D.C.'s needs, and diligent efforts to provide [services] in the interim." *Id.*

---

4       To challenge a school's decision regarding special education services in New Jersey, a parent must file a complaint and request a due process hearing with the NJDOE. *L.P. v. Edison Bd. of Educ.*, 265 N.J. Super. 266, 273 (Law. Div. 1993) ("[The] [NJ]DOE has been established as the forum agency for handling 'due process' petitions to review local agency decisions and actions regarding the provision of a FAPE for handicapped children."). The due process hearing is conducted by an Administrative Law Judge in the Office of Administrative Law ("OAL"). *Id.*

at 15. The ALJ then concluded that the District "did the best it could under the circumstances," and denied all compensatory education.

### C. The Court's Previous Opinion

Plaintiff appealed on March 22, 2018, asking this Court to perform an independent review of the record and to reverse the ALJ's decision. *See* 20 U.S.C. § 1415(i)(2)(A). Thereafter, the parties filed Cross-Motions for Summary Judgment, and I issued my Previous Opinion granting Defendant's motion in part. In particular,

> [I] affirm[ed] the following ALJ determinations: (1) D.C. received a FAPE from the time he enrolled in school until he was placed on Homebound Instruction on October 7, 2016; (2) Parent's requests for prospective injunctive relief, including an interim finding designating Belvidere as the pending placement, were mooted when the State placed D.C. in an inpatient care facility while the administrative proceedings were pending; and (3) the appropriate scope of the [due process] proceedings spanned from the date on which the school year started [September 7, 2016], until Parent filed her due process petition [October 21, 2016].

ECF No. 34, at 32. At the same time, I "reserve[d] judgment on whether D.C. was deprived of a FAPE for the seventeen-day period [October 7, 2016, until November 1, 2016] during which he was not provided with [services]." *Id.* I also questioned whether the District's failure to file for an expedited hearing constituted a procedural violation, as the ALJ found, or a substantive violation.

*Id.* at 22-23. I then directed the parties to submit additional briefs

> to address whether the District's failure to adhere to N.J.A.C. 6A:14-2.7(n), which requires an expedited hearing before a student is placed on Homebound Instruction, is a procedural or substantive violation. If it is a substantive violation, the Parties shall address the implications of a such a violation and the manner in which the ALJ should have treated the violation in her administrative decision. And, if a substantive violation has, in fact, occurred, Defendants may brief any applicable state provisions that may nonetheless serve to excuse their non-compliance with N.J.A.C. 6A:14-2.7(n).

*Id.* at 23. Those briefs are now before the Court.

### D. The Parties' Present Dispute

Plaintiff argues that Defendant owes D.C. compensatory education for not providing any instruction for seventeen school days. Plaintiff also argues that Defendant's "failure to comply with N.J.A.C. § 6A:14-2.7(n) was [itself] both a procedural and substantive violation," because it prevented Plaintiff from promptly asserting D.C.'s stay-put rights. Pl. Supp. Br., at 1. Defendant argues, first, that it did not change D.C.'s placement on October 7, 2016, when it removed him from school, and so was not required to request an expedited hearing or otherwise provide Plaintiff with more process. Def. Supp. Br., at 1. In any event, Defendant argues, it does not owe D.C. compensatory education for any of the Homebound Instruction period because (1) D.C.'s mother "withheld" information from the IEP team regarding D.C.'s needs while D.C. attended Oxford, (2) D.C.'s transfer IEP did not make clear the extent of D.C.'s behavioral issues, (3) it made reasonable efforts to secure a home instructor, and (4) it made reasonable efforts to find an alternative placement. *Id.* at 2.

## II.   LEGAL STANDARD

The standard of review "under which this Court considers an appeal of a state administrative decision under the IDEA differs from that governing the typical review of summary judgment." *M.A. ex rel. G.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd*, 65 Fed. App'x. 404 (3d Cir. 2003). "When deciding an IDEA case, the District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006); *Upper Freehold Regional Bd. of Educ. v. T.W.*, 496 Fed. App'x. 238, 242 (3d Cir. 2012); *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (noting that the District Court "must make its own findings by a preponderance of the evidence" but "also afford 'due weight' to the ALJ's determination"); *see also Bd. of Educ. of Hendrick Hudson Ctrl. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982) ("[D]ue weight shall be given to [state administrative]

proceedings."); *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995) (stating that "due weight" means to "consider—although not necessarily to accept—the administrative fact findings").

Where, as here, a district court reviews administrative fact finding without hearing additional evidence, it is "required to defer to the ALJ's factual findings unless it can point to contrary nontestimonial extrinsic evidence in the record." *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). The purpose of such a deferential standard is to ensure that federal courts do not impose their own "view of preferable educational methods on the states." *Rowley*, 458 U.S. at 207. Nonetheless, a district court's review of legal questions is plenary. *See Carlisle*, 62 F.3d at 528 n.3; *D.B. v. Ocean Twp. Bd. of Educ.*, 985 F. Supp. 457, 500 (D.N.J. 1997), *aff'd*, 159 F.3d 1350 (3d Cir. 1998). And the court may reject the findings of an ALJ, *Carlisle*, 62 F.3d at 529, as long as it "fully explain[s] its reasons" for doing so. *S.H.*, 336 F.3d at 271.

## III.   DISCUSSION

### A.  *Whether Defendant Impermissibly Changed D.C.'s Placement When It Removed Him*

As a threshold matter, Defendant argues that its decision to remove D.C. from school on October 7, 2016, "constituted a disciplinary removal rather than a change in placement under the IDEA and thus did not immediately trigger Plaintiff's due process rights." Def. Supp. Br., at 3; *see also* Def. SUMF, ¶ 193 (describing D.C.'s removal as a "suspension"). For support, Defendant points to the administrative record, insisting that "there is nothing . . . which demonstrates that [Plaintiff] and the District did not 'agree to an appropriate placement' for D.C. after the events of October 6, 2016." Def. Supp. Br., at 4. Defendant maintains instead that "[Plaintiff] and the District began working collaboratively the very next day." Thus, in Defendant's view, the "assertion . . . that a student's placement on home instruction is inherently included within the language of

N.J.A.C. § 6A:14-2.7(n) is inaccurate," *id.* at 2, and "it would be counterintuitive" to penalize the Board for failing to file for a hearing. *Id.* at 5.

Defendant is correct that, under 20 U.S.C. § 1415(k)(1)(B) and N.J.A.C. § 6A:14-2.8(a), a school may remove a child with disabilities for up to ten days without providing any educational services, as long as it would not provide services to a student without disabilities, and that such a decision requires only written notice.[5] *Id.* But Defendant's attempt to side-step N.J.A.C. § 6A:14-2.7(n) and other statutory protections is unpersuasive. First, by its own admission, Defendant *did* change D.C.'s placement when it removed him from school on October 7, 2016, stating that its "primary focus [from that point on] was getting D.C. enrolled *in the right school* in furtherance of a FAPE." Def. Rep. Br., at 10 (emphasis added). Immediately following D.C.'s October 6 incident, one staff member asked whether the school needed to look for "an alternative placement" for D.C., Def. SUMF, ¶ 101, while another stated that "the makeup of our current classroom is not appropriate to meet [D.C.'s] needs," Def. Res. to Pl. SUMF, ¶ 9, and wrote in an email that:

> *I would attempt to look for a more therapeutic environment* [for D.C.] where they can address his emotion management needs. He seems to need more supervision than a general education *school* can offer him . . .

Def. SUMF, ¶ 102 (emphasis added); *see also* Def. Br., Ex. 21, at T169:17-20 (stating that D.C.'s needs were not being met in his current placement at Oxford); *id.* at T169:8-12 ("I was trying to expedite the process and start looking at other placements."); *id.* at T162:1-164:25 (describing efforts to "address different needs than we're addressing right now" and "to move forward in a different direction so that [D.C.] could have some behavioral supports," whether that be "another

---

5    Districts have other authority to address potentially dangerous students. For example, they "may remove a student to an interim alternative educational setting for not more than 45 school days without regard to whether the behavior is determined to be a manifestation of the child's disability" if the student "carries or possesses a weapon to or at school . . . [or] has inflicted serious bodily injury upon another person while at school." 20 U.S.C. § 1415(k)(1)(G). Defendant has not raised this provision to justify its removal decision, nor does the record contain any evidence that D.C. harmed anyone at Oxford.

type of therapeutic setting . . . another local school district . . . [or] in a BD classroom or in a BD program").

Throughout the Homebound Instruction period, moreover, Plaintiff "wanted D.C. returned to Belvidere," ALJ Op. at 12, but Defendant "urg[ed] that it [was] essential [to] place [D.C.] in school as soon as possible," scheduled four visits elsewhere, and "recommended" a program in Warren County as late as October 27, 2016. *Id.*; *see also* Def. SUMF, ¶ 191. Defendant concedes that, on just the third school day after removal—"[b]y October 13, 2016"—D.C. "was no longer attending Belvidere," Def. SUMF, ¶ 118, and denies that it "merely decided to suspend D.C." in its Response to Plaintiff's SUMF, which contradicts its contention here that it sent D.C. home temporarily and for disciplinary purposes. *See* Def. Res. to. Pl. SUMF, ¶ 9. The ALJ thus properly construed D.C.'s removal as more than a mere suspension. *See* ALJ Op., at 15; Def. Br., Ex. 21, at T195:18-196:4 ("I'm not clear that it was a suspension, frankly . . . not every time a child is told they can't come to school is it a suspension . . . . It could be a simple determination that it's not a good fit, placement.").

Not only did Defendant change D.C.'s placement, but it did so unilaterally, in that Plaintiff never agreed to place D.C. on Homebound Instruction. As the ALJ found, "the record reveals no consent to [such a] change." ALJ Op., at 15. Defendant instead "advised" Plaintiff that it had effectively disenrolled D.C. after October 6, 2016, in a letter *ex post*. Def. Supp. Br., at 7. All the while, Plaintiff "simply" pushed for D.C. to return to Belvidere. ALJ Op., at 12; Def. SUMF, ¶ 191. Although Defendant emphasizes its post-removal collaboration with Plaintiff to get around this problem, that argument is without merit: the parties' agreement to work cooperatively to find a new placement after the fact has no bearing on whether Defendant obtained pre-removal consent to the interim placement itself, and in any event, Plaintiff rejected all four placements proposed by

Defendant after removal, for various reasons including location, class composition, and a desire for D.C. to remain at Belvidere. *See* ALJ Op., at 8, 12; *infra*.

Even if Defendant had not understood or intended D.C.'s removal to be a unilateral change of placement, it clearly constituted one under the law. A "change of placement" is not explicitly defined in the IDEA or its implementing regulations, *see D.M. v. New Jersey Dep't of Educ.*, 801 F.3d 205, 215 (3d Cir. 2015), but as a rule, one occurs when a district makes a decision that is "likely to affect in some significant way the child's learning experience." *In re Educ. Assignment of Joseph R.*, 318 Fed. App'x. 113, 119 (3d Cir. 2009). Here, Defendant unilaterally removed D.C. from Oxford, without securing Plaintiff's consent to Homebound Instruction and in an effort to address different needs, which constituted not only an indefinite change in location, but a total cessation of services for an indefinite period. *Accord Bd. of Educ. of Community High Sch. Dist. No. 218, Cook County, Ill. v. Ill. State Bd. of Educ.*, 103 F.3d 545, 548 (7th Cir. 1996) ("[T]he meaning of 'educational placement' falls somewhere between the physical school attended by the child and the abstract goals of a child's IEP."); *Concerned Parents & Citizens for the Continuing Education at Malcolm X v. The New York City Bd. of Educ.*, 629 F.2d 751, 752-54 (2d Cir. 1980) (describing a change in placement as "certain fundamental decisions regarding . . . the most appropriate type of educational program for assisting a child . . . with a handicap"); *Tilton v. Jefferson County Bd. of Educ.*, 705 F.2d 800 (6th Cir. 1983) (holding educational placement to be a combination of academic instruction and treatment). There is no plausible argument that Defendant's decision did not significantly and immediately impact D.C.'s treatment, learning experience, and educational program.

The term "change of placement" has long carried "an expansive reading" to give effect to "the broad remedial purposes" of the IDEA. *DeLeon v. Susquehanna Cmty. Sch. Dist.*, 747 F.2d

149, 153 (3d Cir. 1984). One such purpose is to prevent districts from making precisely the type

of placement decision Plaintiff challenges here. *See, e.g.*, *Honig v. Doe*, 484 U.S. 305, 327 (1988)

("Congress attacked [ ] exclusionary practices [particularly regarding students with emotional

disabilities, 82 percent of whom had unmet needs prior to the IDEA] . . . . and barred schools,

through the stay-put provision, from changing [ ] placement over the parent's objection until all

review proceedings were completed . . . . and allowed for interim placements [only] where parents

and school officials are able to agree on one . . . . Conspicuously absent . . . is any emergency

exception for dangerous students."). To advance this purpose, the IDEA imposes comprehensive

protections before a district may effect a change in placement with which a parent does not agree.

*See, e.g.*, *Sch. Committee of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359,

368 (1985) ("Apparently recognizing that [a] cooperative approach would not always produce a

consensus between the school officials and the parents, and that in any disputes the school officials

would have a natural advantage, Congress incorporated an elaborate set of what it labeled

'procedural safeguards' to insure the full participation of the parents and proper resolution of

substantive disagreements.").

N.J.A.C. § 6A:14-2.7(n) is one such protection, which provides that a district "shall"

request an "expedited hearing" in order "to remove" a student with disabilities if it believes that

"it is dangerous for the student to be in the current placement," but the district and parent "cannot

agree to an appropriate placement." *Id.* This provision clearly applies in this case.[6] Defendant

believed that it was dangerous for D.C. to be at Oxford, informing Plaintiff that it removed D.C.

"to ensure his safety and the safety of others." Def. SUMF, ¶ 103. Plaintiff also did not agree to

---

6    This provision also allows an ALJ to review a district's request to change the placement for a purportedly
dangerous student in the expedited hearing. *See* N.J.C.A. §§ 6A:14-2.7(n)-(q). Because no such hearing ever occurred
here, I express no opinion on whether Defendant had the authority to change D.C.'s placement based on its belief that
he was dangerous, what factors bear on that inquiry, or how an ALJ should review such a decision.

an alternative placement with Defendant beforehand, nor to Homebound Instruction. *See supra*. Accordingly, the ALJ did not err when she found that Defendant should have requested an expedited hearing before it unilaterally removed D.C. on October 7, 2016, and that the failure to do so constitutes a procedural violation under state law.[7]

### B. Whether Defendant Owes Compensatory Education for the Deprivation Period

The crux of the parties' dispute is whether Defendant owes D.C. compensatory education for the seventeen school days during which he did not receive any services. Where a school district falls short of its statutory obligations under the IDEA, a parent is entitled to pursue certain remedies. One remedy is compensatory education, or "replac[ing] [] educational services the child should have received in the first place." *Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 717 (3d Cir. 2010). When reviewing a parent's claims for compensatory education, a court "must (1) consider whether the school district complied with the IDEA's procedural requirements and (2) determine whether the educational program [so provided] was 'reasonably calculated to enable the child to receive educational benefits.'" *Mary T. v Sch. Dist.*, 575 F.3d 235, 249 (3d Cir. 2009) (quoting *Rowley*, 458 U.S. at 207).

"The right to compensatory education should accrue from the point that the school district knows or should know," *M.C. on Behalf of J.C. v. Central Regional Sch. Dist.*, 81 F.3d 389, 396

---

[7] Notwithstanding the above evidence, Defendant failed to provide D.C. with Homebound Instruction for seventeen school days, not ten or fewer, rendering 20 U.S.C. § 1415(k)(1)(B) and N.J.C.A. § 6A:14-2.8(a) further inapplicable. Even if Defendant *did* effect a temporary, disciplinary removal in the beginning, as a matter of law, it changed D.C.'s placement when it removed him for more than ten days. *See* N.J.C.A. § 6A:14-2.8(c) ("Removals of a student with a disability from the student's current educational placement for disciplinary reasons constitutes a change of placement if [t]he removal is for more than 10 consecutive school days."). To avoid this problem, Defendant claims that I cannot count school days after Plaintiff filed her Petition for Due Process on October 21, 2016, because my Previous Opinion "limited" this case to the period of time ending on that date. Def. Supp. Br., at 4. Defendant, however, relies on a mischaracterization of my Previous Opinion. Properly interpreted, I held that ALJ "did not deprive D.C. of a fair hearing by limiting the scope of the administrative proceedings" to claims *arising before* October 21, 2016. *See* ECF No. 33, at 27-28. Because D.C. was not receiving Homebound Instruction prior to October 21, 2016, and the petition seeks to remedy that harm, among others, Plaintiff's compensatory education claim falls within "the scope of the administrative proceedings" here.

(3d Cir. 1996), "that the student is receiving an inappropriate education," *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 250 (3d Cir. 1999), or "of the injury to the child." *G.L.*, 802 F.3d at 618; *see also Lester H. by Octavia P. v. Gilhool*, 916 F.2d 865 (3d Cir. 1990) (holding that a district denied a FAPE because it knew or should have known the child was not receiving sufficient services), *cert. denied*, 499 U.S. 923 (1991); *Carlisle*, 62 F.3d at 537 (reversing an award of compensatory education because the record contained no evidence indicating that the district knew the IEP was inappropriate). But a district "that knows or should know that a child . . . is not receiving more than a *de minimis* educational benefit" is entitled to reasonable time to remedy its failure. *M.C.*, 81 F.3d at 397. Hence, as a rule, "a child 'is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem.'" *G.L.*, 802 F.3d at 618-19. In determining whether to award compensatory education, a reviewing court must "look at a school district's actions during the period of the alleged deprivation." *Mary*, 575 F.3d at 251.

With the law in hand, I turn to the ALJ's decision in this case. The ALJ declined to award any compensatory education, and found that Defendant did not deny D.C. a FAPE, because Defendant did not have reason to know about the severity of D.C.'s needs until it was too late. Specifically, the ALJ reasoned that Defendant "did the best it could under the circumstances" because "[w]hat transpired after October 6, 2016, must be examined through the lens of [Plaintiff's] clear lack of candor," ALJ Op., at 15, and Plaintiff's material omissions as to D.C.'s behavioral issues "left [Defendant] scrambling." *Id.* Defendant asks the Court to affirm these findings. Plaintiff cites *P.N. v. Greco*, 282 F. Supp. 3d 221, 236 (D.N.J. 2003), in response, where the court found a seventeen-day delay to warrant seventeen days of compensatory services. *See* Pl. Supp. Br., at 2-3. For the reasons that follow, I agree with the ALJ that Defendant's limited

14

knowledge about D.C.—largely a result of Plaintiff's material omissions—impeded its ability to promptly provide services after October 7, 2016, and find that Defendant needed until at least October 21, 2016, to determine how to accommodate D.C. Still, I disagree with the ALJ's conclusion that, because of Plaintiff's omissions, D.C. does not deserve *any* compensatory education. I remand to the ALJ to determine how many days, if any, constitute a reasonable delay beyond October 21, 2016, at which point compensatory education would begin to accrue.

      i.    <u>The ALJ Improperly Denied All Compensatory Education Based on Plaintiff's Material Omissions</u>

First, in concluding that Defendant did not deny D.C. a FAPE, the ALJ shifted all of the blame to Plaintiff. *See* ALJ Op., at 16 ("The blame for the disruption to D.C.'s education falls squarely at his mother's feet."). But compensatory education does not turn so sharply on a parent's conduct. *See, e.g.*, *M.C*, 81 F.3d at397; *Ridgewood*, 172 F.3d at 250. In determining what length of delay was reasonable, the ALJ should have also considered Defendant's knowledge of D.C.'s needs and its efforts to resume services during the alleged deprivation period, *see Mary*, 575 F.3d at 251, keeping in mind Plaintiff's prior material omissions, which undoubtedly hindered Defendant in the beginning. *Compare Upper Freehold*, 496 Fed. App'x. at 244 ("[T]he District Court erred when it abbreviated its analysis based on the parents' conduct and failed to determine whether the District's [services were] appropriate. It should have considered the substance of the District's most recent proposed IEP and determined if it met the IDEA's substantive requirements."); *Warren G.*, 190 F.3d at 86 (rejecting the district court's holding that "excessive" parent behavior justified reducing a compensatory education award); *L.T. ex rel. B.T. v. Mansfield Twp. Sch. Dist.*, 2009 WL737108, at *8 (D.N.J. Mar. 17, 2009) (finding that a district denied a FAPE for seventeen days even though parents rejected temporary home instruction pending the hire of a teacher qualified to aid their child, which caused the delay because the teacher found

other employment), *with Cape*, 606 F.3d at 64 (holding that a district was not liable for a procedural violation "thrust upon it by uncooperative parents," but only because the parents refused to attend meetings or "give the District permission to conduct a speech and language evaluation" of her child, which were "necessary in order to develop his IEP" by the first day of school, thereby preventing special education services altogether); *Upper Freeman*, 496 Fed. App'x. at 243 (holding that *Cape* "presented a very unique situation," declining to apply it whenever parents and a school simply reach an "impasse," and limiting it to procedural violations rather than parents "complain" of the "substance" of educational services "developed after meetings and correspondence").

Indeed, although Plaintiff's conduct clearly affected what and when Defendant knew about D.C.'s needs, which impacted how soon Defendant could resume services, *see infra*, the ALJ downplayed the significance of the fact that "all parties knew" D.C. was not receiving a FAPE starting on October 7, 2016, despite Defendant's duty to provide one, in that D.C. had no access to any educational benefits whatsoever. *See, e.g.*, Def. SUMF, ¶ 118 (acknowledging that "it was Belvidere's responsibility to obtain home instruction for [] D.C"); *id.* ¶ 119 (acknowledging that "homebound instruction did not begin on October 7"); Def. Supp. Br., at 8 (acknowledging that it "assumed responsibility for D.C.'s education from the date of his departure"). During this time, D.C. "relax[ed] and watch[ed] TV." Def. Br., Ex. 23, at T44:14-15. These facts matter because knowingly providing no services for a prolonged period of time after a change in placement is not, by definition, "reasonably calculated" to offer a "substantively adequate education," regardless of the specific services the IDEA may require to satisfy a FAPE in a particular case. *See, e.g.*, *Rowley*, 458 U.S. at 200-02, 207 (explaining that "the education to which access is provided [must] be sufficient to confer some educational benefit"); *Endrew F. ex rel. Joseph F. v. Douglas County*

*Sch. Dist. RE-1*, 137 S. Ct. 988, 995 (2017) (emphasizing that "the act guarantees a substantively adequate program of education to all eligible children," which is met with services that are "reasonably calculated" to provide "educational benefits"). Here, "what everyone agree[d] was an inappropriate placement" nevertheless continued for seventeen school days, but the ALJ stressed Plaintiff's prior conduct without acknowledging that reality. *See, e.g.*, *Lester*, 916 F.2d at 873 (awarding compensatory education on this basis).

Relatedly, there is little support for Defendant's argument on appeal that Plaintiff acted unreasonably in declining various alternative placements after October 7, 2016, and is responsible for the delay in services to that extent.[8] *See* Def. Supp. Br., at 6-7 ("Plaintiff declined to enroll D.C. at [an alternative] placement [proposed by the District] which cannot logically be construed as a deprivation of educational services by the Board."). As a rule, a district has "'significant authority to select the school site.'" *White ex rel. v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 382 (3d Cir. 2003); *P.V. ex rel. Valentin v. Sch. Dist. of Phila.*, No. 2:11-04027, 2013 WL 618540, at *8 (E.D. Pa. Feb. 19, 2013) (explaining that parents are not entitled to "'veto power' over [that decision]"). But Plaintiff also has a right under the IDEA to advocate for D.C. *See Burlington*, 471 U.S. at 368 ("In several places, the Act emphasizes the participation of the parents in developing the child's educational program and assessing its effectiveness."); *Rowley*, 458 U.S. at 209 (observing that "parents . . . will not lack ardor in seeking to ensure that handicapped children receive all of the benefits to which they are entitled by the Act"); *Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (emphasizing a parent's "significant role" in the special education process). Faulting Plaintiff for rejecting alternative placements here would "plac[e] parents at risk that their advocacy

---

[8]     Importantly, the ALJ did not find that Plaintiff's actions in this respect were unreasonable, and did not characterize them negatively. *See* ALJ Op., at 8, 12.

may be found extreme at the cost of [compensatory education]." *Warren G.*, 190 F.3d at 85-87

(holding that it "flies in the face of the [parent involvement] policy underlying the IDEA" to bar a

claim merely because of excessive parent conduct, and that "it makes little sense" to decide FAPE

cases "not with reference to what is required by the IDEA to provide an appropriate education but

by comparing the conduct of the school district with that of the parent[]").[9] For these reasons,

Plaintiff's actions and/or omissions do not foreclose all compensatory education.

    ii.    <u>The ALJ Properly Found that Defendant Had to Scramble Through At Least October 21, 2016, to Provide Services to D.C., Which Justifies Some Delay</u>

Although the ALJ improperly relied on Plaintiff's conduct to wholly deny compensatory

education, D.C. is not entitled to services for the *entire* deprivation period either. Rather,

Defendant needed through at least October 21, 2016, to determine how to appropriately

accommodate D.C.

As the ALJ found, Defendant had to "scramble" to provide educational benefits after

D.C.'s incident on October 6, 2016. Defendant abruptly realized at that point that it could not

---

9    Of course, this is not to say that the IDEA permits parents to be intransigent, which could form the basis of a school district's defense. *See Cape*, 606 F.3d at 64 (denying compensatory education because the parents' actions prevented the provision of all special education services). But that is not the case here, where Plaintiff rejected Defendant's proposed placements for good reason: "class composition," *see* ALJ Op., at 12; Def. Br., Ex. 23, at T66:18-67:1 (testifying that, at one school, D.C. would have been placed in a special education classroom with "only a fourth grader"), which state law comprehensively regulates because it is critical to the educational and socioemotional development of students with disabilities, and "location," *see* ALJ Op., at 12; Def. Br., Ex. 23, at T67:2-5 (testifying that the other schools were "a half hour to 45 minutes" away), which is also highly relevant to placement decisions because of its potential to disrupt progress. *See, e.g.*, *Lebron v. North Penn Sch. Dist.*, 769 F. Supp. 2d 788, 801 (E.D. Pa. 2011) ("Geographical proximity is a factor that districts must consider."); *George A. Wallingford Swathmore Sch. Dist.*, 655 F. Supp. 2d 546, 550-51 (E.D. Pa. 2009) (holding that the location of a disabled student's education "cannot be divorced from the [placement] inquiry" even if no material change in services will occur); *R.B. ex rel. Parent v. Mastery Charter School*, 762 F. Supp. 2d 745, 763 & nn. 111-13 (E.D. Pa 2010) ("[The school's] location is relevant to R.B.'s educational placement."); *Cheltenham Sch. Dist. v. Joel P.*, 949 F. Supp. 346, 351-52 (E.D. Pa. 1996) (stating that the IDEA regulations, namely 34 C.F.R. § 300.116(c) and (b)(3), mandate a child with disabilities be placed "as close as possible to the child's home," and "identify geographical proximity as a consideration"), *aff'd*, 135 F.3d 763 (3d Cir. 1997). Location is an important factor because "a transfer to a different school [] often requires a longer commute on the bus, separation from former classmates, and acclimation to an unfamiliar environment," *P.V.*, 2013 WL618540, at *7, any one of which may impede a student with disabilities, especially one who has frequently and recently moved schools, like D.C. *See* ALJ Op., at 5, 8-9 (describing this case as "the heartbreaking story of a parent who has moved from school district to school district[,] apparently in the hope that with each move she could leave her troubled son's problems behind them").

safely invite D.C. back to school, yet it was too late to develop a plan to promptly start even *de minimis* services, given D.C.'s escalating behavioral crisis. *See, e.g.*, Pl. Res. Br., at 3 ("[D]uring the time that the District confined D.C. to home, D.C.'s mental health deteriorated."); Def. Br., Ex. 23, T44:22-45:1 (testifying that D.C.'s "depression went up and he was talking suicidal at times again"); *id.*, Ex. 21, at T122:14-16 (stating that D.C. "ended up in St. Luke's Hospital . . . on October 6"). It would have been imprudent, if not impossible, for Defendant to resume educating D.C. immediately: Defendant did not know the nature or extent of D.C.'s needs, what sort of instruction might be appropriate, or what type of services could satisfy a FAPE, and D.C. had visited the emergency room after his incident, further raising questions as to the severity of his behavioral issues and whether Defendant was equipped to address them.

The administrative record supports the conclusion that it was reasonable for Defendant not to provide services until at least October 21, 2016. Defendant did not begin to understand D.C.'s "complex needs" until the evening of October 6, 2016, when Plaintiff first revealed key behavioral information. *See, e.g.*, Def. SUMF, ¶ 102; *id.* ¶¶ 103-04 ("When Plaintiff [ ] arrived [on October 6, 2016], she shared—for the first time—that [ ] D.C. had been institutionalized."); *id.* ¶ 105 ("Plaintiff [ ] had not revealed that [ ] D.C. had been involved with a classroom struggle with a teacher 3 years earlier."). "Up until that point," Defendant implemented D.C.'s transfer IEP on its terms, but otherwise in the dark about the true character of D.C.'s behavioral issues, or whether he had any at all. *See id.* ¶ 114 (explaining that, when asked for records, Plaintiff responded, "You have everything we have, because we moved around so much"). Defendant could not review a "police report, . . . psychiatric records and related, comprehensive psychiatric notes" until sometime after October 6, 2016. *Id.* ¶¶ 106, 117 ("Plaintiff [ ] failed to return requests for releases so that the District could speak to providers concerning D.C.'s relevant history."); Def. Br., Ex.

21, at T184:1-4 ("I also asked the mother who kept making references to counselors and I kept asking for names of counselors and for her to fill out releases so that we could speak to counselors."). Plaintiff did not consent to a new psychological evaluation for D.C. until October 11, 2016, Def. SUMF, ¶ 104, and apparently did not "respond to [Defendant's] requests regarding selecting an evaluator" thereafter. *Id.* Critically, Defendant could not reach D.C.'s prior school until October 13, 2016, when it learned about his BIP for the first time, *id.* ¶¶ 107-09, by "really pressing [them] for records." Def. Br., Ex. 21, at T183:7-17; *id.* at T184:18-24 (describing "numerous requests for records from . . . the [former] districts of residence" before this point, and problems finding them because Plaintiff and D.C. frequently moved). Defendant did not review paperwork from St. Luke's hospital revealing D.C.'s "mood disorder" until October 21, 2016, at which point Defendant appears to have *finally* collected all relevant data regarding D.C.'s behavioral issues. Def. SUMF, ¶ 120.

Based on this evidence, it is clear that, through at least October 21, 2016, Defendant had to problem-solve in real-time, gather data in piecemeal fashion, "pressur[e] mom that [it] needed additional information," Def. Br., Ex. 22, at T122:10-13, and track down records from old schools and doctors. *Id.*, Ex. 21, at T188:1-3 ("We were continuing to seek records . . . so that we had a comprehensive picture."). Defendant nevertheless scheduled multiple visits to alternative placements, *see* Def. SUMF, ¶ 191, and attempted to secure Homebound Instruction. For example, Belvidere sent an email to a district-wide list-serv on October 7, 2016, *id.* ¶ 193, and discussed home instruction with various staff members through October 10, 2016, *id.* ¶ 194, all of whom declined due to "discomfort working one on one" with D.C. in light of his incident. *Id.* Belvidere then sought Hope Township's help, which "posted [a flyer] in [its] staff lounge" on October 11, 2016, on the advice of the Superintendent of Schools, *id.* ¶¶ 197-98, and when that failed, "reached

20

out to Warren County to inquire about . . . availability" on October 12, 2016. *Id.* ¶ 199; *see also* Def. Br., Ex. 24, at T95:19-96:2 (testifying that it does not "regularly" take "close to a month" to secure Homebound Instruction, but distinguishing the present situation as unusual). All of this despite the fact that both Belvidere and Hope Township are "tiny" school districts with little experience providing such services to high-needs students like D.C. *See* Def. Br., Ex. 21, at T200:9.

Plaintiff relies on *Greco* for the proposition that, as a matter of law, *no* delay was reasonable. *See* 282 F. Supp. 2d 221. It is true that the court in *Greco* awarded full compensatory education for a seventeen-day deprivation, holding that when "a child is simply deprived of educational services by the improper termination of his placement, and where the deprivation could simply be remedied by a resumption of that placement, it is not reasonable for him to be without instruction for any length of time." *Id.* at 236-37. But *Greco* is distinguishable on its facts. In particular, there was no evidence in *Greco* that the student's IEP was inadequate or that the school could not provide a FAPE by immediately restarting the services it terminated. *See id.* at 234-37. Here, on the other hand, Defendant did not know what services *could* satisfy a FAPE, given its limited understanding of D.C.'s needs, *i.e.*, the deprivation would not "simply be remedied" by resuming them. Implementing the transfer IEP would have been inadequate, but commencing some other program immediately would have required Defendant to resort to guess work on how to appropriately educate D.C.

Hence, in all, Defendant's limited knowledge about D.C. impeded its ability to promptly resume instruction. Coupled with its efforts at the beginning of the deprivation period to find an instructor and/or alternative placement for D.C., Defendant reasonably delayed providing services until at least October 21, 2016. *Cf. Warren G.*, 190 F.3d at 85-86 (rejecting a district's argument

shifting blame for a delay, but only because there was no evidence that "parents' conduct obstructed [the district's] ability to [come forward with appropriate IEPs]"). Defendant needed this much time, if not more, to determine what services to arrange and to assemble all necessary information.

iii. There Is Insufficient Evidence to Determine How *Much* Time Constitutes a Reasonable Delay Beyond October 21, 2016

The remaining question is when compensatory education began to accrue. *See Mary*, 81 F.3d at 251. While there is evidence in the record supporting a delay until October 21, 2016, *see supra*, I cannot determine how many days Defendant should reasonably be afforded beyond that, if any, because the ALJ did not consider evidence after that date, *see* Pl. Br., at 25; ALJ Op., at 5-6, even though her decision excused Defendant from liability for compensatory education through November 1, 2016. As such, I remand to the ALJ for further fact-finding on this issue, and summarize below some parameters.

*Homebound Instruction*. There is no evidence as to what, if anything, Hope Township did other than enlist Warren County—*i.e.*, whether it independently attempted to find a home instructor after emailing for help on October 12, 2016, or simply waited for Warren County to come up with something, which it did not do until October 31, 2016. *See, e.g.*, Def. SUMF, ¶ 200; ALJ Op., at 11-12; Def. Br., Ex. 23, at T92:8-12 (describing one email to Warren County on October 12, 2016, and another from Warren County on October 31, 2016); *id.* (June 16, 2017, proceedings), at T193:11-15 (indicating that Hope Township does not know if it sent any other emails during this time period or undertook any other efforts). Moreover, when Hope Township first contacted Warren County, the county stated that it "did not" have a home instructor available, Def. Br., Ex. 23, at T91:12-17, raising questions as to whether Hope Township should have turned to other options. Also relevant here: Hope Township testified that it was Belvidere's

"responsibility" to secure Homebound Instruction under the sending-receiving agreement, Def. Br., Ex. 21, at T193:2-7, T120:14-19, that Belvidere's focus was on finding Homebound Instruction while Hope Township's was on finding an alternative placement, *id.*, Ex. 21, at T94:1 (describing a "divide and conquer" approach), and that securing a home instructor simply "wasn't [its] priority." *Id.*, Ex. 24, at T95:14-15; *id.*, Ex. 21, at T198:2-4 ("[Hope Township] wasn't making the arrangements . . . . Belvidere will tell you more I am sure."). Yet, from "October 11 through October 21," Belvidere "did not take any additional steps" to do so, *id.*, Ex. 23, at T82:14-17, and testified that it "le[ft] the ball" in "[Hope Township's] court." *Id.* at T82:22-25, T85:10-19. And, of course, there is no testimony or documentation regarding anyone's efforts on this issue post-dating October 21, 2016. *Id.* at T82:13-16.

Additionally, there is no evidence as to Warren County's efforts to secure home instruction when the ball was in its court, but particularly after October 21, 2016, when the ALJ cut off evidence. *See, e.g.*, Def. Br., Ex. 21, at T196:21-22 ("[A]nything after October 21 I think is [ ] out of bounds."); *id.* at T126:21-23 (same). Defendant can only speculate that "the availability of staff" perhaps caused the delay, since "[w]e don't just have instructors sitting, standing by waiting on call." *Id.* at T200:6-9. Or that Warren County needed to check certifications, send records, and provide materials. *Id.* at T199:15-23 (testifying that this is "a time-consuming process"). But other testimony indicates that it did not usually so long for home services to begin, *see* Def. Br., Ex. 24, at T95:19-96:2, and that Warren County is "a consortium" that offers "a variety of services" of this type and "contract[s] with multiple agencies," *id.*, Ex. 23, at T91:10-17, raising questions as to the reasonableness of any such delay.

*Returning D.C. to Oxford*. The balance of evidence indicates that Defendant obtained sufficient behavioral data about D.C. by October 21, 2016, when it learned of his "mood disorder,"

*see id.* ¶ 120, but perhaps as early as October 13, 2016, when it learned from D.C.'s prior school that he had a BIP there and did "very well." *Id.* ¶ 109. The record contains no evidence as to why Defendant waited until November 17, 2016, to invite D.C. back,[10] and continued its search for both Homebound Instruction and an alternative placement despite learning about the BIP. The ALJ did not consider such evidence because "it's outside of our window," Def. Br., Ex. 21, at T127:18-21, which extended only "through October 21," 2016, *id.* (June 12, 2017, proceeding) at T166:1-2, leaving open these questions as well.

There is, it seems, some evidence that D.C. could not return sooner because Defendant insisted on a new psychiatric evaluation. *See* Def. Br., at 4. For example, Defendant stated in its initial removal decision that D.C. "would not be allowed back to school without a mental health evaluation performed at St. Luke's," Def. SUMF, ¶ 98, because Defendant "wasn't getting [mental health] information from the parent, and there wasn't information in the record." Def. Br., Ex. 21, at T116:14-16. Plaintiff formally consented on October 11, 2016, Def. SUMF, ¶ 104, then purportedly never responded to Defendant's follow-up requests to select an evaluator. *Id.*; *see also* Def. Br., Ex. 21, at T117:4-13 (describing a voicemail left on Plaintiff's phone). The Court cannot, however, locate evidence in the record that St. Luke's conducted such an evaluation before Defendant asked D.C. back on November 17, 2016. And after requesting the evaluation, Defendant reviewed psychiatric notes from a prior provider, as well as D.C.'s mood diagnosis *from St. Luke's*

---

10      If Defendant adopted the BIP from Woodrow Wilson on November 17, 2016, in whole or in part, it would perhaps be unreasonable for Defendant not to have invited D.C. back soon after learning of the BIP. From the outset of this litigation, Defendant's core argument has been that it did not have precisely this information, and to that extent, could not provide appropriate services to D.C. *See, e.g.*, Def. Br., Ex. 21, at T28:12-14 ("[I]f this District had known that there were different needs than what was represented [when D.C. enrolled], it is likely different services may have been provided in response."). Yet, at the same time, it may not be "appropriate to make a placement decision based on an old [plan]," which could explain why Defendant did not invite back D.C. earlier. Def. Br., Ex. 21 (June 12, 2017, proceedings), at T35:18-19. It is also possible that Defendant needed time to gather resources or make modifications to the BIP, in light of D.C.'s incident on October 6, 2016. These questions underscore the need to remand for further fact-finding.

on October 6, 2016, perhaps rendering new data unnecessary. *See, e.g.*, Def. Br., Ex. 21, at T106:21-25 ("We were finally able to obtain a release [after October 6, 2016] and we asked for the comprehensive psychiatric notes."). Plaintiff also disputes that she did not respond to Defendant's inquiries about selecting an evaluator, and testified that Defendant did not "provide a list of psychiatrists" until November 18, 2016, Def. Br., Ex. 22, at T27:11-19; Pl. Br., at 31, even though she apparently asked for one as early as October 20, 2016. Def. Br., Ex. 22, at T27:20-28:10; *id.*, Ex. 23, at T70:24-71:1. Because the administrative proceeding "did not . . . get into" any of this, *id.*, Ex. 21, at T117:16-19, there are questions as to whether Defendant in fact conditioned D.C.'s return on a new evaluation, how long it maintained that position, and whether any related delay was reasonable under the circumstances.

*Alternative Placements, Transition Plans, and Reentry Conferences*. Defendant scheduled four visits to alternative placements throughout the deprivation period. Def. SUMF, ¶ 190. The last visit occurred on October 26, 2016. *Id.* ¶ 191. In a letter to Plaintiff the next day, Defendant summarized the visits, and expressed a willingness to "consider other schools that [Plaintiff] may have researched," but reiterated its desire to "move forward with the [Warren County Special Services School District]." *Id.* It is unclear what else, if anything, Defendant did to secure an alternative placement around this time, or whether such efforts are sufficient to justify a delay beyond October 21, 2016. Defendant also appears to reject Plaintiff's request for D.C. to return to Oxford in the letter, but the record does not reveal Defendant's basis for doing so, underscoring the difficulty of ascertaining whether Defendant's actions in this respect justified further delay, especially when it may have then had sufficient information about D.C.'s needs to invite him back.

Similar questions arise regarding a "transition plan" to return D.C. to Oxford, which "might" have existed according to Plaintiff, although she "can't remember." Def. Br., Ex. 22, at

T67:22-68:3. There is no other testimony or documentation on that matter. Same for "a reentry conference," *id.*, Ex. 21 (June 12, 2017, proceeding), at T166:16-18, to bring D.C. back to "the school setting." *Id.* at T172:16-18, T173:5-11. Apparently, Defendant discussed whether to plan such a conference around October 7, 2016, but not for long, and one never happened. *Id.* The presence or absence of these efforts might affect the reasonableness of the delay here.

In sum, because the record does not contain evidence regarding Defendant's efforts to resume services after October 21, 2016, even though the ALJ's ruling encompassed the "three-week period" during which D.C. did not receive instruction ending on November 1, 2016, I cannot determine how many days beyond October 21, 2016, constitute a reasonable delay, if any. Thus, I remand for further fact-finding on that issue.[11] *See Carlisle*, 62 F.3d at 526 (authorizing district courts to remand IDEA cases to the state administrative system); *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 526 (D.C. Cir. 2005) ("[I]n light of the absence of pertinent findings in the administrative record and given that both parties previously filed cross-motions for summary judgment rather than exercising their right to 'request' consideration of additional evidence, the district court may determine that the 'appropriate' relief is a remand to the hearing officer for further proceedings."); *JH ex rel. JD v. Henrico County Sch. Bd.*, 395 F.3d 185, 198 (4th Cir. 2005) (remanding a suit to the district court with instructions to remand to the state hearing officer); *Shapiro v. Paradise Valley Unified Sch. Dist. No. 69*, 152 F.3d 1159, 1160 (9th Cir. 1998) (ordering the district court to stay proceedings and remand to the state hearing officer); *see also A.W. ex rel. H.W. v. Middleton Area Sch. Dist.*, No. 1:13-2379, 2015 WL 390864, at *18 (M.D. Pa. Jan. 28, 2015) (remanding "to determine . . . the amount of compensatory education,"

---

11      On remand, it may be important to bear in mind that "a child's entitlement to special education should not . . . be abridged because the district's behavior did not rise to the level of slothfulness or bad faith." *M.C.*, 81 F.3d at 397. The Third Circuit has "rejected a bad faith or egregious circumstances standard." *Ridgewood*, 172 F.3d at 249.

because the court was "unable to ascertain the appropriate amount" on the existing record); *Amanda A. v. Coatesville Area Sch. Dist.*, No. 04-4184, 2005 WL 426090, at *7 (E.D. Pa. Feb. 23, 2005) (remanding to the state administrative process to determine a compensatory education award); *cf. D.F. v. Collingswood Public Schools*, No. 10-594, 2013 WL 3147976, at *1 (D.N.J. June 19, 2013) ("[T]here are no more factual or legal issues remaining in this case, and therefore there is no need to remand.").

C. *Whether Defendant's Failure to Request an Expedited Hearing Violates a Substantive Right Under the IDEA*

The parties' final dispute is whether Defendant's failure to request an expedited hearing before placing D.C. on Homebound Instruction, by itself, violates a substantive right under the IDEA. As discussed, *supra*, a plaintiff who alleges that a school denied her child a FAPE may seek compensatory relief in the form of appropriate educational services. *Mary*, 575 F.3d at 249; *Cape*, 606 F.3d at 66. "On the other hand, a plaintiff alleging only that a school district has failed to comply with a procedural requirement of the IDEA, independent of any resulting deprivation of a FAPE, may only seek injunctive relief for prospective compliance." *Cape*, 606 F.3d at 66; *P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009) ("[C]ompensatory education is not an appropriate remedy for a procedural violation."). A procedural violation "rises to the level of a denial of a FAPE . . . if such violation causes substantive harm to the child or his parents." *Cape*, 606 F.3d at 66 (collecting cases); *see also D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564-67 (3d Cir. 2010). Substantive harm is defined by the IDEA's implementing regulations. It exists where:

> the procedural inadequacies (i)[i]mpeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of the educational benefit.

27

34 C.F.R. § 300.513(a)(2); *see also Cape*, 606 F.3d at 67; N.J.C.A. § 6A:14-2.7(k).

Here, the ALJ did not consider whether Defendant's failure to request an expedited hearing before changing D.C.'s placement constituted a substantive, not merely procedural, violation. That was error. Plaintiff could have invoked the IDEA's stay-put provision in such a hearing, thereby protecting D.C.'s right to a stable educational environment from the *beginning* of the parties' dispute, *i.e.*, prior to removal, and preventing the disruption D.C. experienced *before* Plaintiff requested a hearing herself. The stay-put provision provides that:

> [d]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child . . .

20 U.S.C. § 1415(e)(3); *see also* 34 C.F.R. § 300.513(a); N.J.C.A. § 6A:14-2.7(u) ("Pending the outcome of a due process hearing, *including an expedited due process hearing*, or any administrative or judicial proceeding, no change shall be made to the student's classification, program, or placement unless both parties agree.") (emphasis added).

First, and critically, the Supreme Court has described 20 U.S.C. § 1415(e)(3) as "unequivocal" in keeping students in their current placements from the onset of administrative or judicial proceedings. *Honig*, 484 U.S. at 323; *see also Drinker by Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 864 (3d Cir. 1996) (holding that a student remains in his placement until "the dispute regarding the placement is ultimately resolved . . . . regardless of whether [the] case is meritorious"); *J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 272 (3d Cir. 2002) ("Stay-put orders are designed to maintain the status quo."); *Pardini v. Allegheny Intermediate Unit*, 420 F.3d 181, 192 (3d Cir. 2005) (holding that the "plain meaning of 'current educational placement' refers to the operative placement actually functioning at the time the dispute first arises") (internal quotation and citation omitted); *L.Y. ex rel. J.Y. v. Bayonne Bd. of Educ.*, 384

Fed. App'x. 58, 62 (3d Cir. 2010) (stating that the purpose of the stay-put provision is to prevent a disruption in the first place). "Congress very much meant to strip schools of the unilateral authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school." *Honig*, 484 U.S. at 323; *Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 373 (1985) ("We think at least one purpose of § 1415(e)(3) was to prevent school officials from removing a child from the regular public school classroom over the parents' objection.").

Even more compelling, had Defendant properly requested an expedited hearing, the burden would have been on *it* to show why D.C. needed to be removed over Plaintiff's objections, *see Honig*, 484 U.S. at 327 ("The burden in such cases, of course, rests with the school."); *Henry v. Sch. Admin. Unit No. 29*, 70 F. Supp. 2d 52, 59-60 (D.N.H. 1999) ("[T]he stay-put provision represents a legislative preference for maintaining a child's then-current educational placement during an IDEA dispute that can be overcome only if the party seeking to change the placement can demonstrate an entitlement to preliminary injunctive relief."), rather than on Plaintiff to show why Defendant violated a FAPE in the due process petition she later filed. *See Schaffer*, 546 U.S. at 51, 58 (holding that the burden in an administrative hearing such as the one initiated by Plaintiff's petition is on the party seeking relief). In other words, a district may obtain injunctive relief from a stay-put order that preserves the status quo if "maintaining the child in his or her current placement is substantially likely to result in injury either to himself or herself, or others," *Honig*, 484 U.S. at 328, but the district must show that it "has done all that it reasonably can to reduce the risk that the child will cause injury." *Sch. Dist. of Phila. v. Stephan M.*, No. 97-1154, 1997 WL 89113, at *3 (E.D. Pa. Feb. 27, 1997); *see also Light v. Parkway C-2 Sch. Dist.*, 41 F.3d 1223, 1228 (8th Cir.1994)); *Chester Twp. Bd. of Educ. v. J.R.*, No. 00-4169, 2000 WL 33418868,

at *4 (D.N.J. Oct. 4, 2000) (collecting cases). A plaintiff's only duty in that scenario is to demonstrate that the defendant proposed a change to the student's placement. *See DeLeon*, 747 F.2d at 152. By not requesting an expedited hearing before unilaterally removing D.C., Defendant here not only entirely avoided justifying a departure from the status quo, but improperly "burdened" Plaintiff with the "responsibility of seeking an order to *enforce* the status quo." *Doe v. Brookline Sch. Committee*, 772 F.3d 910, 917 (1st Cir. 1983) (emphasis added).

Most essential of all, perhaps, is the nature of the right protected by the stay-put provision: *maintaining* a student's then-current placement. *See N.D. v. Hawaii Dep't. of Educ.*, 600 F.3d 1104, 1111 (9th Cir. 2010); *Chester*, 2000 WL 33418868, at *3 ("The 'stay-put' provision is designed to ensure stability and consistency in a disabled child's education when that consistency may be elusive."). Such a "time-sensitive" protection cannot be vindicated after the fact—for example, in the hearing Plaintiff requested on October 21, 2016—because "belated" process "provides no remedy for the disruption already suffered," which began as soon as Defendant unilaterally removed D.C on October 7, 2016. *Murphy v. Arlington Central Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 199 (2d Cir. 2002) (Sotomayor, J.) (describing the nature of stay-put rights in the context of the IDEA's exhaustion requirement, and writing that immediate process is the only way to give them "realistic protection"). Once Defendant "ejected" D.C. "from his . . . current educational placement while the administrative process sort[ed] out where [his] proper interim placement [w]ould be," Defendant "complete[d]" a distinct FAPE deprivation, *id.*, even if had Plaintiff requested a comparable hearing and asserted the same rights the very next day. *See N.D.*, 600 F.3d at 1110-11 (rejecting the school's argument that "the steps it has taken will be effective and provide a comparable setting to N.D.'s current educational placement" as a "non-sequitur" given "this particular IDEA right").

Because the IDEA's stay-put provision provides a substantive right to a stable learning environment, *see Tenn. Dep't of Mental Health & Mental Retardation v. Paul B.*, 88 F.3d 1466, 1472 (6th Cir. 1996), but Defendant's actions foreclosed the possibility that Plaintiff could prevent removal in the first place, Defendant denied D.C. a FAPE when it failed to request an expedited hearing under N.J.C.A. § 6A:14-2.7(n), regardless of if or when Plaintiff initiated her own due process petition. *See N.D.*, 600 F.3d at 1111 ("If the child is moved from the current placement during the [administrative] process, then the deprivation of the right has occurred."). That deprivation, however short-lived, is substantive in nature.

## IV.    CONCLUSION

Defendant denied D.C. a FAPE by failing to request a pre-removal hearing in accordance with N.J.C.A. § 6A:14-2.7(n), to the extent that such a decision deprived D.C. of the benefits of his then-current placement. Defendant also may have denied D.C. a FAPE by not providing any services between October 7, 2016, and November 1, 2016, but because Defendant needed until at least October 21, 2016, to determine how to appropriately accommodate D.C., and the ALJ did not hear evidence after that date, I remand as to how many days constitute a reasonable delay beyond October 21, 2016, if any. The parties' Cross-Motions for Summary Judgment are **DENIED**, and this matter is **REMANDED** to the ALJ for further proceedings consistent with this Opinion.

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge